Good morning. We'll call the case of Cooper v. Tokyo Electric Power Company. You may proceed. Good morning, Your Honors. May it please the Court, Daniel Collins, Munger, Tolson, Olson, on behalf of Appellant Tepco. The District Court in this case clearly erred in declining to dismiss the case on the grounds of international comity. The relevant comity factors that were set forth by this Court in Mojica all favor litigating these claims in a Japanese form, and the District Court found that Japan would provide an adequate alternative form for these claims. In particular, the foreign policy interests of both Japan and the United States favor centralizing claims for nuclear damage in the courts of the country where the incident took place or the facility is located. We know that Japan shares that strong interest because it has filed an amicus brief in this Court articulating that interest in very strong terms, expressing its objection to the fact that this is the only claim arising from this incident that is outside of the Japanese court system or dispute system, and saying that that undermines its policy and the framework that it has set in place to respond to. Counsel, do we have any idea whether if a judgment were issued in an American court in this case, whether that judgment would have to be satisfied after the funds that Japan has set aside or whether it would have to be satisfied out of some other fund? If there is compensation for claims that arise from damage from radiation exposure, and that's the compensation we're talking about, compensation for injuries arising from radiation exposure, then the satisfaction of those claims would have to come from the funds. Does that include pain and suffering?  Does that include pain and suffering? That would include pain and suffering. The damage defined in the Act on Compensation for Nuclear Damage in Japan is fairly broadly defined. But to answer your question, those funds would ultimately come from the government of Japan. Indeed, the government of Japan has stated quite bluntly in its amicus brief that it has maintained the solvency of TEPCO by supplying it with funds through NDF in order to pay the substantial tens of billions of dollars of compensation that has already been paid in Japan at this point. Why don't we have a statement of interest from the United States? We asked the district court to request the views of the United States. The district court declined to do that, believed that the court had a sufficient record to rule. We disagreed with that. We asked again at reconsideration, and we raised that issue in our brief, that the district court, certainly before it decided to deny dismissal on international comity, should have requested the views of the United States. So how do we know what the interest of the United States is? I think we know what the interest of the United States is because we have two things that provide strong evidence of that. First, we have the codification of the formal policy that I described in the Convention on Supplementary Compensation. But we also know from the Senate ratification testimony that the executive branch gave to secure the Senate's consent to that treaty that it said that this provision on jurisdictional centralization was not an innovation and not a change in existing law in its view. Well, he said that, but did the Convention say that? The Convention doesn't say that it represents the long-standing view of the United States, and I don't think that we usually take just the word of one person talking on the floor of the Senate as to what the policy of the United States is. Well, two points. First, the Convention is certainly going forward. We had signed it at the time the seat was filed, but Japan had not. The Convention took effect in April of 2015 when Japan became the fifth signatory and the requisite numbers were present for it to take effect. So certainly that is the rule going forward, and that issue has been raised in a separate motion to dismiss that was filed by General Electric that was held in abeyance pending the resolution of this appeal. But that doesn't mean that there wasn't a policy of the United States with respect to this issue prior to that. And this wasn't some stray comment. This was at the testimony given by both the Energy Department and the State Department officials. Both said the same thing in response to a specific question on this point from the chairman of the Foreign Relations Committee. It's at excerpts of Record 181. The chairman said, does this, in effect, limit the rights of U.S. persons to bring suit against entities or companies in the United States courts or against U.S. companies for accidents overseas? And the answer given is, Mr. Chairman, the short answer is yes. But then Mr. Stern, the State Department witness, goes on to say, as a practical matter, in today's legal framework where there is no CSC, we would expect that if a nuclear incident occurs overseas, U.S. courts would assert jurisdiction over a claim only if they concluded that no adequate remedy exists in the court of the country where the incident occurred. That is a clear reference to doctrines such as comity and forum nonconvenience where the adequacy of the forum would be a stop against it. That's an expression of the U.S. policy, which is not an innovation. We see that policy also reflected domestically in the Price-Anderson Act, which also centralizes claims within our federal system. I don't know if it's an expression of policy. It seems to be a prediction of what the witness believes the U.S. courts would do. Isn't that what it amounts to? It's a prediction of what the U.S. courts would do in light of the principles of nuclear liability policy that he set forth and that are embodied in documents. Well, it's a prediction. I mean, it doesn't seem to be an expression of a preference. It's a prediction of what courts he would expect would do in light of what U.S. policy has been in the area of nuclear liability. And we see that policy both domestically in terms of Price-Anderson. We see it in the Paris Convention, the Vienna Convention, which the U.S. is not party to. But we also see it finally codified now officially in the Convention on Supplementary Compensation. So he articulated, both witnesses articulated in their testimony. Well, then are you saying the position of the United States is sufficiently articulated so, say, if we thought otherwise, it's not necessary to ask for a statement of interest from the U.S.? I think that it would be appropriate to request a statement of interest from the U.S., particularly if the court has any doubt on this point as to what U.S. policy is on this point. And the easiest way to do that, and the court pointed out in Mojica it's useful to have, would be to request the views of the United States on that question. We certainly think, as I've articulated in the briefs and just now, that there are sufficient indicia as to what that policy is. But certainly if the court has doubt, then it can request the views of the United States on that question. With respect to the issue of the political question doctrine, the district court erred in this case even though it assumed that if it had to evaluate the reasonableness of discretionary decision making, then the case would be non-justiciable. And the plaintiffs don't really challenge that question. The question is whether or not a judgment about military decision making would need to be, is inextricable from the case and would need to be evaluated in order to adjudicate plaintiff's claims. The district court found that the second amended complaint had narrowed the claim sufficiently that it could avoid any litigation over the U.S. decision to send humanitarian aid following the earthquake and tsunami. Was that correct? The district court erred in that respect in thinking that the reasonableness issue had dropped out of the case. And the district court erred in that regard in two respects. First, the district court treated the issue of foreseeability as dispositive of the issue of the U.S. government's role in causation. Whether you look at it as proximate causation or you look at it as superseding causation, that issue is not exhausted by the concept of foreseeability. Well, didn't the district court also say that in light of the second amended complaint that the defense appeared to be highly implausible or something like that? The district court said that it appeared to be untenable. But that was also legally wrong in the sense that A, as I'm pointing out, was based on the assumption that foreseeability was dispositive of the issue, which it's not. Because even if something is foreseeable, it can still be under, for example, section 452.2, which we had cited of the restatement, that concept. It could still be a superseding cause and could break the chain of proximate causation. But we also pointed out that the foreseeability analysis itself was wrong because the foreseeability analysis was based on the fact that it was foreseeable that the United States would show up and provide humanitarian aid. But that's not the relevant inquiry. The question, even if you look at it from the point of view of foreseeability, which is not the standard, if you look at it from that point of view, then the question is whether or not the acts that caused the injury were foreseeable. And that's where you get to the irreducible allegations of this case that show that the role of the military's decision making does not and cannot drop out of this case. Well, can I just ask you a question? This kind of puzzled me. Everyone in the papers refers to the restatement of law and talks about the claim in terms of United States tort law. Are we clear that that's the law that applies to the analysis of these claims? No. As we indicated in a footnote in our briefs, the choice of law issues have not been teed up and resolved in this case. Doesn't that go to the adequacy of the alternative forum? I don't think it does here in two respects. First, the first step in any choice of law analysis, and it's true both in terms of California choice of law principles, the restatement choice of law principles that would apply under federal common law, or even issue of prescriptive comity under the restatement. All of those. The first question is, is there a relevant difference in the law? None of the parties has with respect to the specific narrow issues that have been presented on the merits. No one has suggested that there is a difference between the relevant bodies of law. It does seem to be, though, when you look at the claim form, it's almost as though it's not a regular tort claim as we view a tort claim in American law or as the restatement views it. It's more of I was injured and here's what you owe me. The court may be referring to the forms that are used in the ADR process, but there is a court process, and that whole proceeding is set forth at length in Professor Taniguchi's declarations. You can file a regular lawsuit in Japanese court, invoke the strict liability principles under the 1961 Act, and then the only issues left are causation and damages. Right, but if you go through the claim procedure that the Japanese government has set up, are you entitled to get punitive damages, for example? There's no punitive damages permitted in Japan. That's a difference in the law. It's a substantial weight in the forum nonconvenience analysis, and the same would be true, I would submit, in the comity analysis. But it's interesting, the adequacy of the alternative forum comes into play in almost every analysis here except the firefighters' role. But there's no question here that the district court did not abuse its discretion in concluding that Japan did provide an adequate forum. It's got a legal framework that fits all of the elements of the Convention on Supplementary Compensation, which says what a nuclear liability regime that it will accept. I don't think that issue is really contested, is it? It's not really contested. The regime of strict liability is there. I would also note, though, on punitive damages, the United States doesn't, under the Price-Anderson Act, does not permit punitive damages to be awarded when the government's backstop has been triggered, which, of course, is true in this case as to Japan. Japan's financial backstop has been triggered. So if we had the same case in the United States, there'd be no punitive damages if Price-Anderson controlled in those circumstances. But there's no question about the adequacy of Japan's system. There is a robust regime there. But let me go back to the political question issue in the 452 analysis. 452.2 provides for an exceptional circumstance, and I acknowledge that it's an exceptional circumstance, where the intervening act of another party with a duty to protect the plaintiff fails to carry out that duty, and then that can raise an issue of superseding causation. Whether or not that applies depends on several factors that are set forth in comment F of the restatement. And if you look at those factors, then this is really the paradigmatic case of it. You look at whether the character and position of the third person and their relation to the plaintiffs. Here it's one of total custody and control of the plaintiffs. You look at the degree of danger, the awareness of the danger. All of those factors here would suggest that the Navy did have a duty, and it did have the capacity in determining where to place them and what measures to take to carry out that duty. And that's why we say that there would be a superseding cause. Let me just briefly address the firefighters' rule, and then I'd like to reserve the rest of my time for rebuttal. With respect to the firefighters' rule, this case provides a very unusual and very narrow situation. It's only been presented in a handful of cases, and that is where an event that isn't triggered by negligence necessarily, here it's a natural disaster, combines with preexisting tortious conduct to produce jointly a result that injures the plaintiff. And the question is whether or not the independent cause exception applies in that circumstance. And for the reasons we've stated in our briefs and the cases that have addressed this, either in a holding or in dicta in their analysis— By the way, is this—I think you depend a great deal on California cases, don't you? Excuse me? You depend a great deal on the California cases. We have looked at a number of cases, the 11th Circuit case— So my question is, I mean, is this a state law rule? Maybe not just California, but is it part of federal common law, or what is it, this firefighter rule? None of the parties have suggested that federal common law would not follow this rule. We've relied on District of Columbia— What if the choice of law is Japanese law? Excuse me? What if the choice of law is Japanese law? The record doesn't specifically address that issue, but what I would point out is that all of the cases that discuss the firefighter's rule say that it rests on principles of assumption of risk. And Professor Taniguchi does state in his declaration that principles of assumption of risk are also recognized in Japanese law. But we're not relying just on California law. We've relied also on the law of District of Columbia. Georgia is applied by the 11th Circuit in the White case, which really is the case that we think is closest to this case. I'd like to reserve the rest of my time for rebuttal unless the Court has any questions at this point. All right. Thank you. Good morning, Your Honors, and may it please the Court. My name is Adam Cabral Bonner, and with my co-counsels Charles Bonner and Paul Garner, we represent the plaintiffs in this matter. I'm going to reserve my comments only to the issues of international comity and forum nonconvenience, and then I'm going to pass the baton. What's important to remember with international comity is that the District Court's decision to cede jurisdiction is wholly discretionary. And the 9th Circuit can affirm the District Court's decision by determining whether or not the District Court used the correct law and applied that law in a way that was neither illogical, implausible, or without support from the record. In this case, it's without question that the District Court applied the correct law. The issue before the 9th Circuit came up after a motion for reconsideration because the Mojica case came down only, I think, in order on the TEPCO's first motion to dismiss or second motion to dismiss. The District Court used the correct law. She applied the five factors from Mojica, and reading her decision, it is abundantly clear that she came down with her decision in a way that was neither illogical nor implausible. So I want to talk about the support for the record. And I want to focus on the key part of the record that supports the District Court's decision both at the time she made it and supports it now. And that, as your honors have referenced, is the lack of any guidance by either the Japanese government or the United States government at the District Court level. And now, even before you, no statement of interest and no amicus brief by the American government. Do we know whether the State Department is aware of these proceedings? Has anybody talked to them? Yes. We have talked to them. We have, in fact, I believe TEPCO requested that they come in with an amicus brief. We all flew out, sat in a giant room, and had a discussion with the State Department, the Attorney General's office, and they grilled us on this issue. And I think it's their lack of an amicus brief points to and is— We now have one. So now what do we do? Well, we have an amicus brief from Japan. Okay. So what do we do with that? Good question. Looking at Mojica, right? What was the concern? Might that change the State Department's view? In other words, shouldn't this court request the views of the State Department before we proceed now that we have an amicus brief from Japan? I would say no, and this is why. Because the current issue is whether, well, the current issue is did the District Court abuse discretion? The District Court didn't have these issues. But whether this court needs to request one, the United States government has had an opportunity to voice its interest. With the District Court retaining jurisdiction, and under Mojica, it's abundantly clear that if the District Court, if the interest of the United States government, was not to have this case heard in District Court, Mojica is a blueprint for how to have the case removed. We know that the State Department, the Attorney General's office, knows about this case. They know Mojica. If they wanted this case to go to Japan, even in light of the Japanese amicus brief, they would have submitted some type of statement indicating that. Do we know that they're aware that the government of Japan has now filed an amicus brief? I don't know that. But when we went and visited with them, they were extremely familiar with all of the pleadings that are going on. We know the amicus brief is public record. It would be, it's really unthinkable that they don't know about the brief. But even more importantly, whether they know about the brief or don't know about the brief, what's in the brief? When you look at Mojica, the concern is about some type of destabilizing force within the relationships of the governments. With specifically looking at the argument, after Mojica, after you address the five points that need to be addressed, the five factors, when you go into the analysis of the United States interest and the Colombian government's interest, the focus of that analysis is not just on the statement of interest and the letters from the Colombian government, but it's specifically on the fact that those letters reference concern about potential damaging consequences to the relationship between the countries. Nothing like that is present in the Japanese amicus brief. It's also important to remember, in Mojica, the concern was essentially about stepping on the toes of another sovereign nation's court's decisions. In this case, that's not going to be at issue either, because liability is not an issue. There's no chance. I'm looking at the amicus brief from the government of Japan, and I'm looking at a sentence on page three of that brief that says, the claims here could result in the application of different legal standards, disparate outcomes, and this could prove highly corrosive to the integrity of the compensation system established by the government of Japan. That's pretty close to saying our courts are dealing with this, and we end up with the possibility of inconsistent judgments. I don't think so, because this is causation and damages only, right? There is no question of liability. And so if there's no question of liability, causation damages are necessarily going to be very distinct to the individuals who are raising them. If in the United States courts or in Japanese courts, our clients will have to prove that their injuries were caused by radiation exposure. So it would be a different situation if the government of Japan and if TEPCO had not assumed liability. If they had said, for example, it was all an act of God, and therefore TEPCO is not responsible, then if our sailors go into district court and say— What about if they say there's a supervening cause? I'm sorry? What about if the Japanese government or TEPCO says there's a supervening cause? Well, the current administration, according to TEPCO's brief, is that it is not no fault, but it's— Strict liability. Strict liability. Strict liability. Exactly. Strict liability. So whatever defenses that would be available will be available in the United States court, but I don't think that's really an issue because we're not focused on the question of liability. And according to the district court's order, even the application of supervening cause is highly improbable. You want California law to apply in this case, is that right? And you're seeking punitive damages. We are seeking punitive damages, but we have not yet addressed the issues of choice of law. We're here at the very early stages. We haven't even gotten to any discovery. Counsel, let me just give you a hypothetical, and let's see how the United States would feel if it were standing in the shoes of the government of Japan. Let's suppose that Southern California experienced a major earthquake and that San Onofre, which I know is in the process of being shut down, but that we had leakage from San Onofre and it damaged a Panamanian-flagged commercial vessel off the coast of California. The United States has provided, through the Price-Anderson Act, for limited liability in which the United States assumes some liability. It also provides that all of those lawsuits must be brought in district court in the United States. If somebody on the Panamanian freighter went to Panamanian courts and then sued the United States under the law of Panama, it's hard to believe that the United States wouldn't regard that as an enormous affront to our sovereignty. I don't know necessarily if that's the case. How could it not, in light of the Price-Anderson Act, for example, and under the treaty that we've just signed? The treaty that we signed with Panama. I think that's the question. Under the treaty that we signed, for example, with Japan, saying that nuclear disasters should be litigated in home states. Okay, so with respect to the treaty that we signed with Japan, that Japan only signed in 2015. At the time of this incident, they had not signed it. But why doesn't that represent the views of the United States as of 2006? Well, it does, but what it represents is a desire for the United States government to limit the liability of nuclear suppliers. That is what, if you look at the experts of record, it says the CSC is designed to limit the liability now facing the United States suppliers. Which we also did in the Price-Anderson Act of 1957. So what I'm saying is that with respect to the United States' interest, the interests are in supporting and limiting liability for the U.S. suppliers. In your analogy, in your hypothetical, you're talking about a Japanese, I'm sorry, a Panamanian ship bringing a suit in Panama. Well, I don't know that Panama is part of the Price-Anderson Act, but the Price-Anderson Act was signed in effect before the— No, the Price-Anderson Act wouldn't have any effect on Panamanian courts. It's not an international treaty. It's a domestic law. I understand, but it was in effect before the disaster that they're trying to use to invoke it. But I don't know that the Price-Anderson Act would be applicable in a Panamanian court. No, it wouldn't be. No, it would not be. And I don't know that the United States, San Onofre, would not have to go— My question, counsel, is wouldn't it be an enormous affront to the United States to think that an American nuclear power plant would have to defend its construction practices and any negligence that it may have engaged in in a Panamanian court in light of all the laws and treaties that we have enacted to address precisely that issue? I don't— It wouldn't be an affront to the United States? I don't know that it would be. The United States would say this is okay, this is a good idea? Well, obviously, the United States government wouldn't want it. I mean, I think that's pretty clear. Okay. But just because the United States government doesn't want it doesn't mean it's contrary or that would be dispositive in this case because the United States has had an opportunity to speak in this case. Isn't that what the nature of comedy is? It is. That we want people to—that we want to treat other people the way that we expect to be treated? That's exactly what we want. But what we're looking for is what has the government articulated as their interest. And in this case, I think we can take their silence regarding this case, this TEPCO case. We can take their silence as essentially an affirmation of the district court's order because that's the status quo. When you guys—when your honors affirm the district court's order, it goes back to the district court for further proceeding. That's the status quo. If the United States government did not want that status quo, they certainly would have come in and made a statement to that effect.  Since I don't know what the—I don't have an articulated U.S. policy interest in this record, I'm wondering if the U.S. has compensated the military servers in any way because of the injuries. I mean, would there be anything within the government that would have been affected because of compensation for— No, is the short answer. And even with respect to getting VA benefits, most of them are still— That's what I was just asking. No, the answer is no. There's been no compensation. And even with respect to— Well, there's been medical care, right? There has been—well, there has been medical care, but whether or not the VA has recognized that the injuries for ongoing medical care were related to their service, that is a live question for most of the sailors. But I'd like to pass my time on. All right. Thank you. Good morning, Your Honors. Charles Bonner, the Law Offices of Bonner & Bonner. And just to continue with the line of question of whether or not the U.S. has compensated the sailors, I'd like to just introduce some of the sailors who are here, who were on the part of the Operation Tomodachi, along with former Senator John Edwards, who is supporting the sailors. But no, they have not been compensated. And the mere meager benefits that they're receiving from the VA are totally inadequate for the kinds of problems that they are experiencing. They're being treated, but not necessarily compensated in terms of tort liability. That is correct. They're being treated, but treated in a very limited manner because many of the doctors can't figure out many of the complexities that these radiation diseases are presenting. So it's really beyond the capacity of the VA. And it's a large number of— Well, you might—I mean, since we're speculating as to the U.S. policy interests, maybe the U.S. interest would be to have the TEPCO give just compensation to the United States military who engage in humanitarian efforts on their behalf. That's a good suggestion. In fact, as Cabral indicated, we went to the State Department at TEPCO's request, and we met with a large room of lawyers, almost the size of this lawyer from every department in the United States government, and they grilled us on all these issues, including whether or not the United States government should file a statement of interest. The fact that the United States government has declined to file a statement of interest in spite of their TEPCO's request and our detailed discussion with them is an indication that they do not feel that there's any tension between the United States government and the Japanese government about this. At what point was this conference held? It was March of this year. Was it before? It was March of this year. After the district court decided? Yes, after the district court decided. And, in fact, just recently, within the last 40 days, I spoke with and sent an email to the U.S. Attorney's Solicitor General, Ginger Andes, requesting that they come in and come to this argument. So they are aware of all the briefs. They have briefed this case thoroughly. Their silence speaks volumes. I'd like to address very quickly, however, the issue of the political question doctrine. TEPCO would have to show, and they failed in this burden, they would have to show a completely independent, intervening, unforeseeable act that was highly exceptional and that involved some exceptional circumstances in order for there to be a superseding cause that would cut off their liability here and pass it on to the Navy. They cannot shoulder that burden. And, more importantly, the district court does not need to look at the judgment of the military here. Our Second Amendment complaint has claims solely based on negligence and strict liability. These young sailors deserve their day in court. This is still just at the pleading stage, at the complaint stage. We need to go to the discovery stage. If at that stage they unearth facts they believe would show a political question, then they can bring a summary judgment motion. But not at this stage. These young sailors deserve their day in court under that flag and before this court. They simply have failed their burden. I'd like to direct the courts to one last point, and that is whether or not the military acted reasonably. In paragraph 141 of our complaint, it contains a publication from the Navy stating that the Navy moved the 7th Fleet, temporarily repositioned it after detecting high radiation in the area, and that 17 crew members were irradiated. And we know that they positioned the ship out some 50 nautical miles where they were still taking on radiation. And then they went out 100 nautical miles where Captain Mueller, Troy Mueller, documented the radiation as 30 times higher than normal. And that's in some kind of logarithmic progression. So the point is that the military always act reasonably, contrary to what TEPCO would have you believe, that some kind of way they were negligent or some kind of way the district court needs to evaluate the reasonableness of the military's action. The district court does not need to do that. The Harris versus Kellogg case says the district court can ask the question of who, what, when, why. Not why. Not why you get into the military reasoning or the military strategy or the military wisdom, but where the ship was positioned, how many people were on the ships, where did it move, in order to determine not the military's judgment, but the viability of these claims. And right now the only issues here are causation and damages. Defense says it wants to bring in this issue of superseding causation, which in a way seems kind of ironic to me because it was the Japanese government that asked President Obama to send the ships there in the first place. And to turn that action into the superseding cause of the injuries does seem to turn it on its head. But that's just a light impression that I have of this. You're spot on, Your Honor. It turns justice on its head because, of course, we are there to provide humanitarian aid. Indeed, Operation Tamadachi is help our friends. And now these young sailors, and that's why I call this the lonely sailors case, they feel abandoned by their friends. They feel abandoned by the Amicus Curia brief here, apparently which is sponsored by the Koch brothers. They feel abandoned by their government. Are you talking about the Admiral's brief? The Admiral's brief. It's from a nonprofit. It's not in favor of either party. No, it's not in favor, but when you read through it, it's just a replication of the defense brief. It's the same issues. But these young sailors, they feel abandoned by even their government in not standing up behind them and even their doctors who have difficulty diagnosing some of their illnesses, their leukemias, their excessive bleedings, and the cause of the death of now seven of them in a very short time. These were very healthy young 18, 19, 20-year-olds who of course had to be healthy to get into the Navy, and now they're all sick. And we ask you to affirm the studious opinion of this district court and allow these young sailors to move swiftly as they did when they were providing humanitarian aid to justice in this court. Thank you very much. Thank you, counsel. You have time. Oh, wait. Okay, you have a minute and 45 seconds. Good morning, Your Honors. My name is Paul Garner. I, along with my co-counsel, have the privilege and honor of representing these first responders who went in to give humanitarian aid to the people of Japan. And all they're seeking now is respect, due process of law. They swore an allegiance to uphold our Constitution. They sacrificed their well-being and, in seven cases, their lives. We're into second generation now, Your Honor. Your Honors, this is a matter of respect, and this court should respect both Japan and this country in our continuing effort to have peaceful, supportive relations. The fact that Japan has not filed a formal statement of interest with the Obama administration speaks volumes. I'm sorry. The government of Japan has not filed a statement of interest with our State Department or with the executive branch of our government in any way, shape, or form. We met with Homeland Security. We met with Attorney General's Office. We met with the Solicitor General's Office. They're well aware that these cases have been pending now for almost four years. We don't have an answer to any complaint here. What the TEPCO multibillion-dollar corporation is asking you to do, let's be clear about this, is to say that you should become fact-finders. You should usurp the power of the district court judge who decided the issues that were presented in a 10B6 motion to test the adequacy of what was being presented at the time. But what Japan says here is that if we let the cases go forward here, it's going to jeopardize its compensation system. Well, let someone say that from our government. Let someone come forward and say that, Judge Sammartino, you can't adjudicate these cases because it would be disrespectful and would some manner affect the compensation scheme that this multibillion-dollar-for-profit corporation, which was clearly departed from accepted norms in conducting their activities at the time. We might be back here to see you. But at this juncture, we have no facts other than the well-plaid complaint, the fact that it could possibly, this is all supposition by a well-crafted defense at an early stage of the litigation. Now, why should these U.S. citizens be deprived of their right to due process that any other American citizen would be entitled to receive at this juncture? I don't think it's a question of due process, is it? I believe it is. Where did you raise that in your brief, that it's a matter of due process? Well, I don't know that, Your Honor, with all due respect, I don't know that it could be interpreted in any other way, because their defense is that you're going to somehow jeopardize a scheme that has been set up in Japan that doesn't have ex post facto effect. Are you challenging the district court's finding that Japan would be a satisfactory alternative? I am saying in reality. Counsel, you could answer my question. I think you could answer it with the answer of no. No. Okay. So you're not challenging that Japan would be so it's not a matter of due process whether it gets tried here or whether it gets tried in Japan. It's a matter of international comedy, which is a different question. International comedy must consider the real world as it exists today. Now, what has been suggested to you is that these sailors ---- Is that a question of due process? I believe it is. I mean, that we have to consider the world as it is today? I believe it is. Are you saying that they can't get adequate compensation in Japan? Well, I think it's clear from everybody's perspective here that their system of compensation is at odds with ours. It's different from ours. That's true. It is not a full measure of justice. But, Counsel, you've asked us to uphold the district court's findings. I am. And the district court found that Japan was an adequate alternative. I think that's respect. I think that shows respect. But at this ---- Counsel, I don't understand your argument. My argument is this, Your Honor. Forgive me for not making it clear to you. We're in a position now where the wrongdoer has said that you should have a time out here, that you should have all this considered under a framework that existed in Japan, or that exists in Japan, which doesn't really comport with the law that the district court would apply to these cases. And we don't have here a knee-jerk reaction by Judge Sammartino. This is really the fourth bite of the apple that they've had. The only reason we're before you now is because of the Mujika case. That is the ---- that's the underpinning here. And Your Honor is more familiar with the Mujika case than anyone. And I suggest to Your Honor that the district court did her level best to apply the rule of law as it exists in this circuit. So why at this stage of the proceedings would we waste valuable time and not preserve the status quo? We owe it to these people to do our best because justice delayed is justice denied. We have ---- we know that it's an ongoing situation with these people, that they're not going to get better unless there's intervention. I submit to Your Honor that that's the reason that we have laws in this country. That's the reason we have due process in this country is to give everyone an opportunity to be heard. They're not being heard over there. They can't go over there to be heard. That would be ---- Well, we understand that. And I think you're exceeding your time. I understand that. Could we request just one additional minute, Your Honor, to address the firefighters' rule? With respect to the firefighters' rule, Your Honor, which is really a stretch here, now they're asking you to step in the shoes of our legislature and write a ---- Well, let me just ask. Does the firefighters' rule exist in Japan? Firefighters' rule what? Does it exist in Japan? Is it a law? I confess that ---- And if you're talking about assumption of risk, did the assailants assume the risk? I don't think this thing is fully enough brief. I don't think any of us can say that they assumed any risk that they didn't know about. They didn't respond to Fukushima Daiichi. They didn't go to cordon off the area like firemen do and take control. This isn't a situation where a garage door malfunctioned. These are three nuclear reactors that core melted down and caused harm, not only to them, but to people throughout Japan. That's a given. All right. So on the adequacy of the forum, the last question I have is, can it really be adequate when some of the Japanese people who have put in claims feel that they've been treated fairly? How would the American claimants be treated if even the Japanese ---- With all due respect to the Japanese, I don't see how they can do that, Your Honor. I think that's a stretch. It's a supposition. And, see, here's the thing. If our government wants to put insurance into effect through a supplementary compensation scheme, the way it's written is you have to disclose where your reactors are and you have to pay into the system, and you can't do it retrospectively. But, counsel, as much time as you're taking, I'm going to feel compelled to give to the other side. Give them as much time as your honors feel is necessary to do justice here. One last point, Your Honor. No one in Japan has been compensated for pain and suffering. All the money that's been paid out has been for economic damages. Is that in the record? That's in the record. Yes, Your Honor. They have declarations. And so these sales will not get a dime. They will never go to Japan. If this court rejects them, then that's the end of their case because they can't fly their doctors to Japan. They can't take their experts to Japan. Many of them are sick and ailing and lonely and depressed that they're even in this predicament. They're young people. So it's important that this court affirms it. We understand that, and we have read all the briefs. Thank you, Your Honor, and we would consent to give them as much time as they feel they need. Okay, but I don't feel that we're going to give them as much time as they feel they need. Thank you very much, Your Honor. Thank you. A couple of points. Can I just ask a question? Sure. Is Tokyo Electric Power Company owned by the Japanese government or backed by the Japanese government? A majority of its shares are owned, and we have this in our corporate disclosure statement, by an entity we've abbreviated as NDF, which was a specially created entity in August of 2011 that would qualify as an agency or instrumentality of the Japanese government under the FSIA. That was created after the meltdown? Correct. It was created by special legislation. So it owns a majority of TEPCO shares, and it also provides, through special compensation funds, it provides the cash that has been used for the compensation that's been provided thus far. Now, it is true, and it was stated in the record, that there had not been any claims made, was the declaration that we submitted, for physical injuries in Japan. And we explained in a footnote in our brief why you would not be surprised that there were not a large number of physical injury claims in Japan. And that's because of the way in which the radiation release occurred in this case. This has been looked at. We cited the international agency reports that have examined this issue, and also because of the success of the evacuation that was put in very quickly. Most of the damages that have been paid and alleged have arisen from the evacuation itself. I would note, it's not in the record, but I would note that there is one pending lawsuit now for a radiation exposure injury that is in Japan. And Professor Taniguchi made very clear that there's nothing in Japanese law that would impede the payment of a meritorious claim for physical injury in Japan. It's clearly covered by the statute. Is that outside the TPF program? Is that outside the program? Excuse me, Your Honor? Is that outside the program or in court? No, it's right in the statute. The Act on Compensation for Nuclear Damage broadly defines damage, clearly includes physical injury if it's caused by exposure to radiation. When you say physical injury, does that include pain and suffering? It would also include pain and suffering. That's also set forth in Professor Taniguchi's declaration. With respect to the positions of the United States and Japan, you know, the SG's office refers to unbidden amicus briefs, which are briefs not requested by the court. There's a lot of reasons why they declined to file an unbidden brief in a private litigation. I have no doubt that if this court were to ask them for their views, they would give the court the courtesy to respond. And does the Department of Justice have a view independent of the State Department? Are those two different views? I'm sort of curious as to why the State Department didn't sui sponte, jump into this lawsuit in one way or another, to tell us either this was a great idea or it was not a good idea, or even that they had no position. Because sometimes we get an SOI that says we take no position on this. As counsel has indicated, both sides met with a large number of people. They decided not to file an unbidden brief. And this meeting was after the district court had issued its decision while this appeal was pending. It was in, I think the timing was described incorrectly, it was in December of 2015. Okay. It was when both sides met and then a decision was made. May I clarify, both sides met with State or Justice or both? It was a joint meeting. It was a large number of people with State and Justice and Department of Defense. So, you know, but the decision was made not to submit an unbidden brief, but if the court would ask, I believe that they would give the courtesy of expressing their views. What happens, counsel, if we ask and we get either something that says we don't oppose the lawsuit or something that says we take no position? Then the court, under the standards in MAHICA, has to make its own independent judgment of how to assess the input that it's received from the executive branch. But wouldn't an SOI of that nature really count against you? It certainly, if the government said affirmatively that it did not object to the suit going forward, that would certainly make it become a liability. What happens if it says we don't take any position? That seems like that's a non-objection, even though they haven't said we don't object. No, I don't think you can read that inference from silence. Well, why wouldn't, if their interest was to preserve comedy with the Japanese government, we have the Japanese government submitting an amicus brief saying we want to hear, and they say we don't have a position or we don't agree that it needs to be in Japan, it can be in the U.S. Why doesn't it end it, really? Why should we then, why would the court come in and say we're supposed to be analyzing U.S. policy, and what we're struggling to do to answer is what is it in this case? If the court has doubts about the content of U.S. policy, if the court has doubts about how it should assess the impact on foreign relations of the strong brief that was filed by the Japanese government, if the court wants additional details about what communication was made by the Japanese government to the State Department, as we indicated in the transcripted excerpts of Record 140 that such communication was made, the court can just simply ask the government. The government of Japan has conveyed its objections to the State Department? A statement of its interests was communicated to the State Department. That's an excerpt of Record 140. We relayed that at the hearing on the motion. And do we know what the nature of that was? The statement is not in the record at all, so we don't have the details. So we don't know whether the government of Japan says we strenuously object or we somewhat object or we don't object? Well, we know what they said in the amicus brief to this court. That's a fairly strong objection. They may have changed their mind here. No, I think the filing an amicus brief in the U.S. Court of Appeals is a fairly solemn event. What was the timing on the government of Japan's communication with the State Department? When was that? I don't, as I stand here, know exactly the timing. Do you have a year? I believe it was shortly before the hearing on reconsideration. Okay, so it was while the district court suit was pending. It was while the district court suit was pending. I would also note that the U.S. ratified the convention, although it didn't take effect until 2015. The U.S. ratification was in 2006, so at that point it was the official policy of the United States from that point forward. The district court also did not make any finding that anyone in Japan had been treated unfairly in the claims system, and I don't think that there really is a record for that assertion in this case. With respect to the political question issue, the proximate cause issue is intrinsic in the case because of the irreducible allegations. The fact that they were alleged to have been brought to the area when it was known there was radiation exposure, when they had detection equipment, and the allegation is that they were placed two miles from the coast in such an intense area of radiation, despite the detection equipment, that they suffered injuries, hundreds of people suffered injuries within two years of exposure. Those inescapable allegations are what make the issue of the reasonableness of the Navy's actions. But the allegation is they went there unknowing that the meltdown was as extensive as it was, and then the ship's own nuclear detection determined that some of the Navy men were being radiated, so they moved 100 miles away, that's what the allegation is. Correct, that's the allegation, but they also allege that they were placed two miles off the coast into an area of such intense radiation exposure that it's produced this level of injury for this many people so quickly. And it's that combination, the fact that they were not in the area, were brought into the area by the military, and placed in that situation that intrinsically and inescapably and inextricably raises the issue of the reasonableness of the Navy's decision-making, which is why it's non-justiciable. And then finally, with respect to the issue of the firefighters' role in the assumption of risk, all the cases make clear that they're not talking about assumption of risk in the sense that the individual police officer, firefighter, military officer is personally assuming the risk. The idea is that the government has assumed the risk on behalf of these, and the government therefore has the concomitant responsibility to provide the compensation. If it sends people into harm's way, you know, purposely and knowing of the levels of risk, it should be expected to provide that compensation. That's the rationale behind the rule. Unless the court has any further questions, then we'll go ahead and submit. Thank you very much. Thank you. And the case of Cooper v. Tokyo Electric Power Company will be submitted now. The next case we are going to have to clear the courtroom.
judges: Tashima, Wardlaw, Bybee